UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

File No.  12-cv-3010 (DSD/TNL)

Tsige A. Dereje,

      Plaintiff,                        **REPORT AND RECOMMENDATION**

   v.

Carolyn W. Colvin,[1]
Acting Commissioner of Social Security

      Defendant.

---

Donald C. Erickson, Esq., Fryberger, Buchanan, Smith & Frederick, P.A., 302 W. Superior Street, Suite 700, Duluth, MN 55802, for Plaintiff.

Gregory Brooker and Ann M. Bildtsen, Assistant United States Attorneys, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Defendant.
_____

TONY N. LEUNG, United States Magistrate Judge.

    Plaintiff Tsige Dereje ("Dereje") disputes the Commissioner's denial of his application for social security income ("SSI").   Judicial review in the United States District Court for the District of Minnesota is proper under 42 U.S.C. §§ 405, 1383(c)(3). This matter is before the Court, United States Magistrate Judge Tony N. Leung, for a report and recommendation to the United States District Court on the parties' cross

_____

[1] Carolyn W. Colvin, Acting Commissioner of the Social Security Administration, is substituted as the defendant in this action pursuant to Federal Rule of Civil Procedure 25(d).

motions for summary judgment. *See* 28 U.S.C. § 636(b)(1); D.Minn. LR 72.1-2. Based on the record and proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, and Defendant's motion for summary judgment be **GRANTED**.

## I.    BACKGROUND

### A.    Procedural History

Dereje was 45 years old when he filed his application for SSI on February 25, 2011. (Tr. 150-56.)[2]  He alleged disability from back pain, chronic leg pain, asthma, headache, and depression.  (Tr. 173, 218.)  Dereje's application was denied initially and upon reconsideration.  (Tr. 84-90.)  He requested a hearing and a hearing was held on March 28, 2012, before Administrative Law Judge ("ALJ") David B. Washington.  (Tr. 91-93, 26-47.)  On April 6, 2012, the ALJ denied Dereje's claim.  (Tr. 5-22.)  Dereje requested review of the ALJ's decision by the Appeals Council.  (Tr. 23-24.)  The Appeals Council denied review on September 26, 2012 (Tr. 1-4), and the ALJ's decision became the final decision of the Commissioner of Social Security.  *See Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008) (Appeals Council's denial of review made the ALJ's decision the final decision of the Commissioner).  Dereje initiated the present action for judicial review on November 30, 2012.

### B.    Employment and Accident History

Dereje was in an accident in 1997 and suffered a fractured left tibia, repaired by placement of a rod in his left leg.  (Tr. 484-85.)  He recovered from the injury, and between 2003 and April 2009, he worked in various occupations including assembly,

---

[2] The Court uses the abbreviation "Tr." to reference the transcript of the Administrative Record, Doc. No. 7.

sterilizing surgical equipment, driving a cab, stocking a grocery store, and cooking.  (Tr. 182, 238.)  His full-time employment as a cook ended after he hurt his low back and fractured his tailbone in two separate accidents in December 2009.  (Tr. 182, 252, 480, 333-34.)  Dereje also served a prison sentence in 2008-09, and he received mental health treatment in prison.  (Tr. 472.)

### C.   Medical Records

#### 1.   Before the SSI Application

Dereje sought mental health treatment at Community University Health Care Center in April 2009, after he ran out of Effexor and Zyprexa, which he said were prescribed to him while he was in prison earlier that year.  (*Id.*)  Dereje reported that the medications helped with his depression, suicidal ideation, and visual and auditory hallucinations.  (*Id.*)  While he was in prison, his wife was reported to child protection, their children were placed in foster care, and his wife moved to Denver, Colorado.  (*Id.*)  After he was released from prison, Dereje's church supported him.  (*Id.*)

On examination by Nurse Maureen Malloy, Dereje was sad and tearful and reported having poor concentration and auditory and visual hallucinations.  (*Id.*)  He was diagnosed with depression with psychotic features, and Effexor and Zyprexa were prescribed.  (*Id.*)  A week later, his medications were increased because he was having trouble sleeping and feeling hopeless.  (Tr. 472.)

On May 15, 2009, Dereje had improved but was somewhat depressed about his situation and anxious about finding a job and getting his children back.  (Tr. 469.)  He denied suicidal ideation and hallucinations.  (*Id.*)  According to a record from Hennepin County Medical Center, Dereje was diagnosed with severe major depression with

psychotic features on June 5, 2009, but the issue resolved as of July 28, 2009, and his diagnosis was major depression, single episode, in remission.  (Tr. 521.)

Dereje went to the emergency room at the University of Minnesota Medical Center Fairview ("UMMC Fairview"), on December 9, 2009, five days after he slipped and fell on a soapy floor at work.  (Tr. 419, 421.)  His low back pain worsened after his fall, and it took him two hours to get out of bed because his back was stiff.  (Tr. 421.) He did not have numbness or tingling in his legs, but his legs felt weak when he tried to stand.  (*Id.*)  On examination, there was diffuse lumbar tenderness with evident muscle spasm.  (*Id.*)  The strength, reflexes, and sensation in his lower extremities were normal.  (*Id.*)  A CT scan of his lumbar spine showed moderate to severe central stenosis[3] at L4-5 as result of a broad-based disc bulge with central disc protrusion.  (Tr. 253.)  He was treated with Valium and morphine and was able to get up and walk around normally after treatment.  (Tr. 421.)  He was prescribed anti-inflammatories and an analgesic.  (*Id.*)

On December 22, 2009, Dereje was in a hit-and-run accident caused by another driver hitting the parked car in which Dereje was seated.  (Tr. 246-47.)  He was diagnosed with a fractured coccyx[4] and was prescribed Percocet and ibuprofen.  (Tr. 245.)  On December 29, 2009, Dereje saw Physician Assistant Millicent Marwa at Cedar-Riverside People's Center for continued low back pain without radiation.  (Tr. 551.)  Marwa provided Dereje with a letter to stay off work.  (Tr. 552, 241-42.)  She referred Dereje to the Institute for Low Back and Neck Care.  (Tr. 601.)

---

[3] Stenosis is a stricture or narrowing of any canal or orifice.  *Stedman's Medical Dictionary* (*Stedman's*) 1695 (27th ed. 2000).
[4] The coccyx is the tailbone, formed by the fusion of four rudimentary vertebrae. *Stedman's* at 374.

Dereje saw a chiropractor on January 2, 2010.  (Tr. 258-72.)  He was diagnosed with acute-post traumatic sprain/strain injury to the cervical, thoracic and lumbosacral spine, complicated by postural abnormalities, decreased range of motion, muscle spasm and trigger points.  (Tr. 260.)  He had radicular symptoms in the lower extremities.  (*Id.*)  His cervical spine MRI findings were essentially negative.  (Tr. 534-35.)

On January 4, 2010, Dereje was evaluated by Dr. David Strothman at the Institute for Low Back and Neck Care.  (Tr. 601.)  Dereje complained primarily of low back pain radiating to his legs, with numbness in his legs down to his big toes.  (*Id.*)  He had difficulty controlling his bladder since the pain began.  (*Id.*)  Ice, medication, and rest improved his pain.  (*Id.*)  Dereje said he had been working three jobs, suffering from excessive stress.  (*Id.*)  On examination, his gait was slow; he could not heel or toe walk; he could not bend without severe pain; his muscle strength was difficult to assess; he had a loss of sensation in the L3 nerve roots, but otherwise his sensation; and his reflexes were normal.  (*Id.*)

Dr. Strothman ordered x-rays of the coccyx and lumbar spine.  (*Id.*)  The x-rays showed displacement of the coccyx and very mild lumbar levoscoliosis.[5]  (Tr. 604.)  Dereje also had a lumbar MRI that day, which revealed shallow left disc protrusion at L1-2 and shallow disc protrusions at L4-5 and L5-S1 that did not significantly compromise the central canal; mild narrowing of rececess for the proximal L5 nerve roots bilaterally; the shallow disc protrusion at L5-S1 contacted the dural sac and proximal S1 nerve roots, but the structures were not displaced or compromised; nerve

---

[5] Levo means to the left and scoliosis means abnormal lateral and rotational curvature of the vertebral column.  *Stedman's* at 994, 1606.

root canals were patent; and a coccygeal fracture was present, with mild posterior displacement of C2 and edema.  (Tr. 532-33.)

On February 16, 2010, Dereje asked Physician Assistant Marwa for a letter stating he could return to light-duty work.  (Tr. 554.)  He had started physical therapy and was doing well.  (*Id.*)  Marwa then conducted Dereje's annual physical examination on May 3, 2010.  (Tr. 557-58.)  In a review of systems, he had no pain complaints.  (*Id.*)  He could walk normally and was neurologically intact.  (Tr. 558.)

Dereje underwent an independent medical examination with Dr. Mark Thomas on May 20, 2010, relating to litigation over the hit-and-run accident.  (Tr. 277-88.)  Dereje told Dr. Thomas that he had returned to full-time work one week after his slip and fall in early December, and then the car accident occurred later that month.  (Tr. 278-79.)  His neck and upper back pain had improved since the accident, but he suffered low back pain, aggravated by prolonged, sitting, standing or pushing more than 15 to 20 pounds.  (Tr. 279.)  Prior to both accidents, he had been working 80 hours per week.  (Tr. 280.)  Dereje was now working less than 20 hours per week.  (*Id.*)  Dr. Thomas noted there was relatively minor damage to Dereje's vehicle from the accident.  (*Id.*)

Upon examination, Dereje appeared healthy and in no acute distress.  (Tr. 283.)  He walked with a slow deliberate gait, rose slowly from sitting, was tender to palpation of the entire spine, and exhibited an exaggerated withdrawal response to light touch.  (*Id.*)  There was a mild limitation in lumbar range of motion.  (*Id.*)  His neurologic examination was normal.  (Tr. 284.)  Dr. Thomas opined that Dereje's minor sprain/strain had resolved, and there were findings of symptom magnification on

examination.  (Tr. 284-85.)  He believed Dereje would not have any work restrictions from the car accident, although he would have some symptoms.  (Tr. 285-86.)

Dereje returned to Physician Assistant Marwa on June 11, 2010, complaining of asthma and left leg pain after standing for one hour.  (Tr. 560.)  Marwa prescribed Advair and prednisone, and she referred Dereje to Minnesota Orthopaedic Specialists for evaluation of his left leg.  (Tr. 560-62.)  Several days later, Dereje told Physician Assistant Jeffrey Ballard at Minnesota Orthopaedic Specialists that his left leg had improved after his 1998 accident and surgery.  (Tr. 484-86.)  At present, his new job required standing, and he had significant pain over the upper tibia.  (Tr. 484.)  He said the severity was moderate, the symptoms started one year ago, and the episodes of pain were increasing.  (*Id.*)  He did not complain of low back pain.  (*Id.*)

On examination, Dereje appeared healthy, pleasant, and relaxed; he was oriented with normal mood and affect; his gait was antalgic;[6] he had swelling and tenderness of the left lower leg; and full range of motion and strength in the left leg.  (Tr. 485.)  Ballard ordered a CT scan of Dereje's left leg and gave Dereje work restrictions of standing for one-hour pending Ballard's review of the CT scan.  (*Id.*)  The CT scan showed solid bony union of a tibial fracture, with old fracture deformity.  (Tr. 309).  A few days later, Dereje had swelling and tenderness over the left lower leg, and positive straight leg raise tests.  (Tr. 482-83.)  Ballard diagnosed lumbosacral neuritis or radiculitis[7] and lumbar spinal stenosis.  (Tr. 482.)  He opined that Dereje's leg pain and numbness probably related to the spinal stenosis, not his well-healed tibia fracture.  (Tr.

---

[6] Antalgic is a characteristic of gait resulting from pain on weight bearing, in which the stance phase of gait is shortened on the affected side.  *Stedman's* at 722.

[7] Neuritis is inflammation of a nerve, and radiculitis is a disorder of the spinal nerve roots.  *Stedman's* at 1207, 1503.

483.)  He recommended epidural steroid injection and physical therapy.  (*Id.*)  Dereje did not want an injection.  (*Id.*)

Dereje was evaluated for physical therapy at Fairview Sports and Orthopedic Care University Village on July 2, 2010.  (Tr. 311.)  His primary complaint was numbness of the left leg, with aching intermittent pain, gradually worsening since onset.  (*Id.*)  His treatment would be directed at increasing his range of motion and strength.  (Tr. 312.)  On July 7, 2010, Dereje's chiropractor, Dr. Brian Sontag, wrote a letter explaining that Dereje was off work from January 2, 2010 through February 16, 2010, and that he was or should have been on light work restrictions thereafter, with a maximum 20 pounds lifting, frequently lifting 10 pounds, and walking or standing to a significant degree may be expected.  (Tr. 290.)

Dereje's physical therapy discharge records indicated that he did not show for the last session he had requested.  (Tr. 500-01.)  Per Dereje's request, they had been focusing on his left leg weakness in physical therapy.  (Tr. 500.)  On July 30, 2010, Physical Therapist Jen Torma noted that Dereje's left leg was stronger and less swollen.  (Tr. 506.)  He could walk for an hour before sitting.  (*Id.*)  He complained that his low back still hurt, but he did not want physical therapy for his back while he was being treated by a chiropractor.  (*Id.*)  Due to his improvement, Torma recommended advancing his treatment plan to more complex exercises.  (*Id.*)  At his final visit on August 3, 2010, his leg pain had reduced in severity from six out of ten to four.  (Tr. 489.)  He had no adverse reaction to treatment or activity.  (*Id.*)  He met his long-term goals of walking for 30 minutes and bending to reach his ankles.  (Tr. 489, 500.)  Dereje was instructed in a home-treatment plan and self-management of symptoms.  (*Id.*)

Dereje asked Physician Assistant Marwa to complete a Medical Opinion form for him on December 3, 2010.  (Tr. 563.)  Marwa noted that Dereje had been taking pain medication and muscle relaxants without any permanent improvement.  (*Id.*)  She also noted that Dereje was "distressed about this on and off back pain."  (*Id.*)  On examination, Dereje denied numbness and tingling in his extremities.  (*Id.*)  His back examination revealed muscle stiffness and pain with range-of-motion exercises.  (*Id.*)  Marwa provided a disability opinion based on Dereje's back pain.  (Tr. 564.)  Later that month, Dereje asked Dr. Kay Maust at Cedar Riverside People's Center for a referral to orthopedics.  (Tr. 564-65.)  Dr. Maust wrote a letter for Dereje, stating he could not lift since the December 2009 accidents; he could not presently work; and he would be reevaluated on January 17, 2011.  (Tr. 240.)

Dereje called paramedics on January 1, 2011, after he bent to tie his shoes and could not stand up straight.  (Tr. 522-24.)  Dereje was examined by Dr. Eric Ling in the Hennepin County Medical Center emergency room.  (Tr. 522.)  Dereje said this was his usual back pain.  (*Id.*)  He denied paresthesia[8] or focal weakness, and he said his pain did not radiate.  (*Id.*)  On examination, he was cooperative, awake, alert, oriented and appeared mildly uncomfortable.  (Tr. 524.)  He was tender to palpation of his lumbar paraspinals, his strength testing was limited by pain, and sensation was intact.  (*Id.*)  Dr. Ling noted that because Dereje had severe pain with moving his toes, his pain might be psychogenic.  (*Id.*)  Nurse Carol Peterson wrote that Dereje's exam was not consistent

---

[8] Paresthesia is an abnormal sensation such as burning, pricking, tickling or tingling. *Stedman's* at 1316.

with cauda equina syndrome[9] or radiculopathy, and he was able to ambulate without difficulty after treatment.  (Tr. 525.)

A few days later, Dereje saw Physician Assistant Jacob Ash at Minnesota Orthopaedic Specialists and reported that his back pain had been exacerbated in the last several months.  (Tr. 480-81.)  He had lost his job and was having trouble finding work due to his pain.  (Tr. 480.)  On examination, his spine was rigid and his lumbar flexion was near normal but painful.  (*Id.*)  His gait was normal, and he had normal range of motion.  (*Id.*)  Ash opined that epidural steroid injections were the best conservative treatment that Dereje had not yet tried, and he also referred Dereje to the Institute for Athletic Medicine for lumbar stabilization and core strengthening.  (Tr. 481, 297.)  Dereje had an epidural steroid injection on January 12, 2011.  (Tr. 565.)

Dereje saw Dr. Joan Trowbridge at the University of Minnesota Medical Center Riverside Primary Care Clinic ("UMMC Riverside") to establish care on January 24, 2011.  (Tr. 348-52.)  Dereje asked Dr. Trowbridge to complete a Medical Opinion form for state benefits.  (Tr. 348.)  He was taking Flexeril for tension headaches and tight upper back muscles.  (*Id.*)  He had intermittent asthma.  (*Id.*)  Dr. Trowbridge noted he was dramatic about his pain, and he gave poor effort on his left leg raise test, so the test was questionably negative.  (Tr. 349.)  Dr. Trowbridge felt Dereje's pain was primarily musculoskeletal.  (Tr. 350.)  She referred Dereje for nutritional education, physical therapy and pain evaluation.  (Tr. 361.)  Dr. Trowbridge completed a Medical Opinion

---

[9] The cauda equina comprises the nerve roots of all the spinal nerves below the first lumbar.  *Stedman's* at 303.  Cauda equine syndrome is an uncommon compression of the nerves at the end of the spinal cord.  Typical symptoms include low back pain, sciatica, saddle sensory changes, bladder and bowel incontinence, and lower extremity motor and sensory loss.  William C. Shiel Jr., M.D., *Cauda Equina Syndrome*, available at http://www.medicinenet.com/cauda_equina_syndrome/article.htm.

form for Dereje, stating he was disabled by chronic low back and left leg pain, and he could lift a maximum of 20 pounds, and 10 pounds frequently, per his chiropractor.  (Tr. 323.)  He also suffered mild depression.  (*Id.*)

The same day, Dereje also saw Social Worker Liz Weir for a behavioral health consultation.   (Tr. 361-65.)   Dereje's score on the PHQ-9[10] suggested moderate depression, although he verbally denied depression.  (Tr. 362.)  His score on the GAD-7[11] suggested mild anxiety, and Dereje said he was anxious about being unable to work.  (*Id.*)  His sleep was normal, unless he had a pain flare.  (*Id.*)  He denied a history of psychiatric hospitalization or suicide attempt, except once when he was much younger.  (*Id.*)  He was separated from wife and children, but he talked to his children on the phone.  (*Id.*)  He lived alone in an apartment and had a strong network of friends and in his church community.  (*Id.*)

In his mental status examination, he was oriented, appropriately dressed and groomed, pleasant and cooperative, with good insight and judgment, normal thought content, and coherent thought process.  (*Id.*)  His speech was frequently difficult to understand, but he had good eye contact and normal motor behavior.  (*Id.*)  His mildly depressed mood and mental status examination were not consistent with his self-report on the PHQ-9 and GAD-7 questionnaires.  (*Id.*)  Weir noted that Dereje felt supported by friends and in his faith community.  (*Id.*)

---

[10] The Patient Health Questionnaire ("PHQ-9") is a multipurpose instrument for screening, diagnosing, monitoring and measuring the severity of depression.  It is a brief self-report tool.  Center for Quality Assessment and Improvement in Mental Health, available at http://www.cqaimh.org/pdf/tool_phq9.pdf.

[11] The GAD-7 is a seven-item anxiety scale for screening generalized anxiety disorder and assessing its severity.  RL Spitzer, K. Korenke, B. Lowe, *A Brief Measure for Assessing Generalized Anxiety Disorder:  the GAD-7*, Arch Intern. Med., 2006 May 22; 166 (10): 1092-7, available at http://www.ncbi.nlm.nih.gov/pubmed/16717171.

On February 9, 2011, Dereje told Physical Therapist Leah Cruz at the Institute for Athletic Medicine that his low back pain, which radiated to his legs, was constant and severe. (Tr. 511.) Dereje's gait was antalgic, and his lumbar range of motion was significantly limited due to pain. (Tr. 512.) Dereje was hypersensitive to light touch on his lumbar spine. (*Id.*) He would receive the following treatment for pain and decreased function: hot/cold therapy, electric stimulation, manual therapy, therapeutic exercise, therapeutic activities, neuro re-education and instruction in a home program. (Tr. 513.) His rehabilitation potential to resume normal activities was excellent. (*Id.*)[12]

Dereje next followed up with Dr. Trowbridge on February 24, 2011. (Tr. 368-77.) He was only sleeping for ninety minutes at night. (Tr. 368.) On examination, he was healthy, alert, and in no distress; his left leg was weak compared to the right; and his straight leg raise test was slightly positive on the left. (Tr. 369.) He poorly tolerated touch on his back, and his lumbar range of motion was reduced. (*Id.*) Dr. Trowbridge diagnosed chronic back pain, disc disease, spinal stenosis, and muscular and nerve pain. (*Id.*) She increased Dereje's dosage of Elavil, gabapentin and Lidoderm, and she prescribed Lyrica and referred Dereje to Dr. Ferron for pain management. (*Id.*) She also offered an optional trial of Remeron for insomnia. (*Id.*) Dereje applied for SSI on February 25, 2011. (Tr. 150-56.)

### 2. After the SSI Application

Dereje attended an independent medical examination with Dr. Mark Friedland on March 7, 2011, relating to his December 5, 2009 work injury. (Tr. 332-42.) Dereje complained of constant low back pain extending to his tailbone, bilateral thigh pain and

---

[12] There are no later physical therapy records in the administrative record from this provider. *See* Tr. 296-97, 495-517.

numbness, and diffuse bilateral leg weakness.  (Tr. 335.)  Dereje said he had no trouble working two jobs for 70 to 90 hours per week until he slipped and fell at work on December 5, 2009.  (Tr. 333.)  Dereje went back to work at one part-time job with work restrictions one week later.  (Tr. 334.)  His tailbone was then fractured in the hit-and-run accident later that month.  (*Id.*)

On examination, Dereje was 5'8" tall and weighed 200 pounds.  (Tr. 335.)  He sat reasonably comfortably throughout the exam, and he stood up and moved slowly.  (*Id.*)  He claimed he could not stand on his toes, but he was able to stand on his heels.  (*Id.*)  Upon examination, he complained of low back pain from maneuvers that did not require any movement of the lumbar spine.  (Tr. 335, 341.)  He exhibited diffuse "touch me not" tenderness and exaggerated withdrawal response to barely perceptible touch on his thoracic spine.  (*Id.*)  He actually walked away and had to be coaxed back.  (Tr. 336.)  Upon lumbar spine examination, Dereje markedly self-limited movement, with very exaggerated tenderness on exam, no palpable spasm, negative straight leg raise test in a seated position, but positive in supine position, and no radicular symptoms.  (*Id.*)  On neurologic examination, he had no atrophy or weakness of the extremities but subjectively had decreased light touch sensation on his thighs.  (*Id.*)  Otherwise, he had normal sensation in his arms and legs, and normal reflexes.  (*Id.*)

Dr. Friedland noted that Dereje's statements about his work-related injury in a deposition taken on January 7, 2011, were inconsistent with his statements to Dr. Friedland.  (Tr. 337.)  Dr. Friedland also noted that Dereje made no mention of low back pain when seen for a routine exam on May 3, 2010.  (Tr. 339.)  When Dereje was seen to discuss his nutritional status on May 18, 2010, he reported he had started running to

improve his overall health.  (*Id.*)  Dr. Friedland diagnosed mild, age-appropriate, chronic L4-S1 degenerative disc disease, objectively resolved lumbosacral sprain/strain, displaced coccygeal fracture, status-post intramedullary interlocking rodding of the left tibial fracture, and marked symptom magnification.  (Tr. 340.)  He opined that Dereje would have no work restrictions after May 20, 2010.  (Tr. 342.)

On March 16, 2011, Dereje told Dr. Mohammed Roble at Cedar Riverside People's Center that he was having shortness of breath on a daily basis, he had been using an albuterol inhaler, but he had not been using his Advair.  (Tr. 566-67.)  A few days later, Dereje reported to Dr. Trowbridge that his back pain had worsened and he was having trouble breathing and atypical chest pain.  (Tr. 381-86.)  Dr. Trowbridge increased his dose of Advair and showed him how to use the inhaler properly.  (Tr. 381.)  She also noted Dereje was not using his Lidoderm patches correctly for his back pain.  (*Id.*)  His neurological examination was normal, and she thought his chest pain was most likely musculoskeletal.  (Tr. 384.)  Dr. Trowbridge completed a Medical Opinion form for Dereje, indicating that he had permanent conditions of chronic low back pain and asthma, and he also had controlled mild depression.  (Tr. 453.)  He could not work for the foreseeable future.  (*Id.*)

On April 22, 2011, Dereje went to the emergency room at UMMC Fairview because he had not slept much in the last few nights.  (Tr. 415-18.)  He also said he was taking medication for depression.  (Tr. 416.)  He denied hearing voices.  (*Id.*)  On physical examination, he exhibited no edema or tenderness.  (Tr. 417.)  On neurological and psychiatric examination, he was oriented; his affect was appropriate; his speech was normal; and he was withdrawn and exhibited a depressed mood, but did not have

homicidal or suicidal thoughts.  (*Id.*)  Dr. Kevin Meier prescribed Ambien for insomnia. (*Id.*)

Two months later, Dereje underwent a physical consultative examination with Dr. A. Neil Johnson, to evaluate his Social Security disability application.  (Tr. 423-26.) Dereje was from Ethiopia but had been in the United States for ten years.  (Tr. 423.)  He walked using one crutch and said he did not like to walk without it because his left leg was painful and weak.  (*Id.*)  He said he could sit or stand for 30 minutes and walk five blocks using one crutch.  (*Id.*)  In addition to tailbone, back and leg pain, Dereje complained of asthma and severe depression.  (*Id.*)

On examination, he was pleasant and cooperative, his speech was clear, and he walked with a severe limp to the right.  (Tr. 424.)  He had severe difficulty getting on and off the exam table; he was unable to heel and toe walk, squat or hop; his left ankle and left knee were enlarged; and he had pain with motion of his back, hips, knees and ankles, worse on the left.  (*Id.*)  He also had decreased range of motion in lumbar flexion as well as the left hip, knee and ankle.  (*Id.*)  His motor strength in the left leg was three to four out of five, and he had some numbness over the left leg and shin.  (Tr. 425.)  Dr. Johnson opined that Dereje's risk of falling was great due to weakness and numbness of his left leg, and he should use an assistive device and avoid heights, inclines and uneven surfaces.  (Tr. 426.)

On July 11, 2011, Dereje told Dr. Trowbridge that his lumbar back pain was nine out of ten in severity.  (Tr. 584.)  He needed help to put on his shoes, he used a shower chair, and his friends helped him with cleaning, shopping, and cooking.  (*Id.*)  Back pain awoke him at night.  (*Id.*)  Dr. Trowbridge noted Dereje had never filled his Remeron

prescription, and he was not taking his full dose of Elavil.  (Tr. 585.)  She offered Dereje a referral for counseling for his mild depression.  (*Id.*)  One examination, his back muscles were very tight; he was not using a cane; he had difficulty changing position; his flexion, bending and twisting were limited, although he gave poor effort; his left leg raise test was mildly positive; and his left leg was weak compared to the right leg.  (*Id.*) Dr. Trowbridge completed a Medical Opinion form for Dereje, opining that he could not work for the foreseeable future due to his conditions of status post left leg fracture, coccyx fracture, asthma, lumbar back pain, mild depression, and tension headaches. (Tr. 451.)

Dereje underwent a consultative psychological examination with Dr. Alford Karayusuf on July 15, 2011, for evaluation of his Social Security disability claim.  (Tr. 460-62.)  Dr. Karayusuf had only one medical record to review, an April 22, 2011 emergency room report.  (Tr. 460.)  Dereje said he struggled with constant pain for sixteen years, since his first accident.  (*Id.*)  Dr. Karayusuf found the interview to be very difficult because Dereje made frequent contradictory statements, yet appeared to believe he was being consistent.  (*Id.*)  For example, Dereje said the police took his children, and then he denied it.  (Tr. 460-61.)  Dereje said he was psychiatrically hospitalized at the Hennepin County Medical Center for a suicide attempt when his children were taken, and he was hospitalized at Fairview Riverside Hospital for depression just two months ago.  (Tr. 461.)  When asked if he was still depressed, Dereje wanted to know why Dr. Karayusuf would think that, and said he was not depressed at all.  (*Id.*)  Dr. Karayusuf did not think Dereje was deliberately lying.  (*Id.*) Dereje seemed to believe whatever version of the truth he was telling from one minute

to the next.  (*Id.*)  Dr. Karayusuf also thought the interview would have gone much better with an interpreter because he thought Dereje's English was poor, although Dereje perceived his English to be fluent.  (Tr. 460.)

Dereje described his current living situation.  (Tr. 461.)  He lived in an apartment with a male friend who did their cooking, cleaning and grocery shopping.  (*Id.*)  Dereje said he went to church once a week, but otherwise he was idle and did not read, watch television, have any hobbies or other friends, and no contact with his children.  (*Id.*)  Dereje said he heard voices from outer space telling him to hurt himself.  (*Id.*)  He also believed people did not like him and wanted to hurt him.  (*Id.*)  Dr. Karayusuf believed he had no insight into his problems.  (*Id.*)  Dereje appeared anxious, tense and subdued, his answers were not consistent, his immediate recall was impaired, but his mental status examination was otherwise normal.  (Tr. 461-62.)  Dr. Karayusuf diagnosed major depression with psychotic features.  (Tr. 462.)  He opined that Dereje was able to understand, retain and follow simple directions; he was able to perform work involving superficial, infrequent interactions with coworkers, supervisors and public, and he could perform simple, routine, concrete, tangible tasks with persistence and pace.  (*Id.*)

Dr. Trowbridge referred Dereje to Dr. Susan Ferron for consultation, and on October 3, 2011, Dereje told Dr. Ferron he had not been pain-free since his accidents in December 2009.  (Tr. 652.)  His severe low back pain extended into his left thigh, and he experienced weakness and tingling in the left foot and toes.  (*Id.*)  Sometimes, he could not feel his left leg at all.  (*Id.*)  He could not sit for more than an hour, walking was painful, and he had trouble lifting.  (*Id.*)  On examination, Dereje exhibited

exaggerated pain behavior.  (Tr. 653.)  He limped favoring his left leg and could walk on his heels but not his toes.  (*Id.*)  His leg strength and neurological examinations were normal.  (*Id.*)  He did not want to do low back range of motion exercises due to pain. (*Id.*)  Dr. Ferron noted that his exam was somewhat consistent with L5 radiculopathy, but his pain behaviors made him hard to diagnose.  (Tr. 654.)  She recommended some medication changes, ordered a lumbar MRI, and referred Dereje for pain management. (*Id.*)

Dereje saw Physician Assistant Marwa on November 4, 2011, reporting he was seen in an emergency room for back pain several days earlier.  (Tr. 567-68.)  Dereje wanted a referral to the Institute for Low Back Pain.  (Tr. 568.)  He did not have muscle spasms or leg weakness on examination.  (*Id.*)  He said he could not bend forward, and standing was difficult.  (*Id.*)  Marwa referred Dereje to the Institute for Low Back Pain, where he saw Nurse Practitioner Sarah Heinle on December 13, 2011.  (Tr. 615.) Dereje said he fell at work one month ago[13] and was then laid off his job.  (*Id.*)  His tailbone, low back, and left leg pain were worsening.  (*Id.*)  He was under chiropractic care and could not sit more than an hour, lift more than five pounds or walk more than a half block.  (*Id.*)

On examination, his gait and ambulation were normal, flexion and extension of his lumbar spine were limited by pain; he was hypersensitive to touch; his straight leg raise test was positive on the left; and the examination was otherwise normal.  (*Id.*) Nurse Heinle ordered an MRI of Dereje's lumbar spine, noting his previous MRI did not explain his back and leg symptoms, and he alleged the pain had changed and become

---

[13] Dereje's certified earnings record does not show any earnings in 2011.  (Tr. 167-68.)

more intense.   (*Id.*)   On December 14, 2011, the MRI showed resolution of edema around the coccyx compared to the MRI of January 4, 2010; there was a persistent deformity related to the old tailbone fracture, slightly improved; there was no evidence of lumbar compression fracture; there were degenerative disc changes at L1-2, L4-5, and L5-S1, with small disc bulge and annular tear without stenosis at L5-S1; mild disc bulge and facet arthropathy without stenosis at L4-5; and small disc bulge at L1-2 without stenosis.   (Tr. 616-17.)   Dr. Erik Ekstrom interpreted the MRI, stating there were no significant disc herniations, no nerve impingement, and that conservative care such as physical therapy was appropriate.   (Tr. 618.)   Drs. Kjome and Vincent at Cedar Riverside People's Center also reviewed Dereje's December 2011 lumbar MRI and found no significant arthritis, no nerve impingement, and no significant disc herniations. (Tr. 571-72.)   They declined to complete disability paperwork for Dereje.   (Tr. 572.)

Dereje saw Physician Assistant Marwa for completion of a Medical Opinion form for state benefits on January 2, 2012.   (Tr. 575.)   Marwa completed the form, but the only finding in Dereje's examination was subjective tenderness of the lower back.   (*Id.*) Dereje saw Dr. Trowbridge two days later and said he was using a TENS unit; he was off the muscle relaxant; and he was not sure if he was taking Elavil.   (Tr. 581.)   On examination, Dereje appeared healthy but obese, and his asthma had improved.   (*Id.*) He was restless while sitting in a chair.   (Tr. 582.)   He had left lumbar radicular symptoms with weakness but normal reflexes.   (*Id.*)

On February 24, 2012, Dereje told Dr. Trowbridge he had finished his probation, and he was sad and missed his family.   (Tr. 661-62.)   He complained of severe pain and had to stand several times.   (Tr. 661.)   Dr. Trowbridge noted they discussed "thoughts

vs. voices," apparently in context of Dereje's endorsement of hearing voices.   (*Id.*)
Dereje said he needed help dressing, bathing, cooking and cleaning.   (*Id.*)   He could sit
and stand for thirty minutes at a time; he spent five hours lying down; and he took naps
during the day.   (*Id.*)   On examination, Dereje's mentation appeared normal; his
reflexes, sensation and extremities were normal, but his gait suggested back
discomfort.   (Tr. 662.)   Dr. Trowbridge diagnosed left lumbar radicular symptoms with
weakness, and she increased his dosage of Seroquel for insomnia, and prescribed a
muscle relaxant.   (*Id.*)   She referred Dereje to occupational therapy for an evaluation of
his work restrictions.   (*Id.*)   Dereje was also seen in the behavioral health clinic that day
for depression and anxiety.   (Tr. 671-76.)   He continued to struggle with his mood,
hearing voices telling him to hurt himself and seeing demons.   (Tr. 672.)   His mental
status examination was normal.   (*Id.*)

Dereje underwent an occupational assessment on March 7, 2012, evaluated by
Gretchen Welshons.   (Tr. 627-29.)   Dereje reported that he rented a room from a friend
and performed all of his personal cares, but, on bad days, he had trouble with his socks
and shoes because bending was difficult.   (Tr. 627.)   He could drive short distances and
help his friend with shopping.   (*Id.*)   He had not been doing stretching and strengthening
exercises.   (*Id.*)   On examination, he walked with an antalgic gait but did not use an
assistive device.   (*Id.*)   He exhibited decreased extension of the left knee, forty degree
flexion of the lumbar spine, limited extension and side bend of the lumbar spine, and
limited rotation due to tailbone pain.   (*Id.*)   His straight leg raise test was positive.   (*Id.*)
He was very guarded in changing position; he had decreased strength in his left leg;

and he demonstrated poor tolerance for sitting, standing and walking.  (Tr. 629.)  He said he used a cane, but he did not have it with him.  (*Id.*)

Upon evaluation, lifting five pounds increased Dereje's symptoms, but he used poor body mechanics.  (Tr. 628.)  He walked slowly and used a rail to assist climbing a ramp.  (*Id.*)  He declined to do the stair exercise.  (*Id.*)  Welshons opined that Dereje could sit for 20 to 30 minutes at a time, for a total of two or three hours per day; stand 10 to 20 minutes at a time, for a total of one or two hours per day, and walk for 20 minutes at a time, for a total of two hours per day.  (*Id.*)  He could never squat, kneel or balance, but he could frequently reach.  (Tr. 629.)  Welshons thought Dereje might benefit from physical therapy, but his current abilities were less than sedentary.  (*Id.*)  Dr. Trowbridge incorporated these restrictions into her Medical Source Statement of Dereje's work abilities.  (Tr. 619-25.)  She also opined that emotional factors might contribute to Dereje's pain and noted he had a pending evaluation with Dr. Truong on March 14, 2012, to rule out a thought disorder.  (Tr. 620.)

### D.   Hearing Testimony

Dereje testified that he was involved in an accident years ago, and his injury was treated by placing a rod in his left leg.  (Tr. 29-30.)  He recovered from that accident, but in December 2009 he was in two accidents.  (*Id.*)  He broke his tailbone and learned he had three compressed discs in his spine.  (*Id.*)  Before the December 2009 accidents, he had been working 80 to 90 hours per week.  (Tr. 30.)  He also had severe asthma and did not sleep well.  (Tr. 30-31.)  He used to be a surgery instrument technician, and he had seven licenses to operate a forklift, but he could no longer work.  (Tr. 31.)  Medications helped relieve his pain a little.  (Tr. 36.)  He needed help showering and

with laundry.  (Tr. 37.)  He had difficulty climbing stairs.  (Tr. 37-38.)  He used an inhaler daily for asthma.   (Tr. 38.)  He slept only three or four hours at night.  (Tr. 39.)

Dereje testified that he can lift a gallon of milk, and he can sit for thirty minutes in a comfortable chair, but sitting hurts his upper back.  (Tr. 31.)  He can walk for 20 or 30 minutes and stand for 30 minutes.  (Tr. 32, 35.)  On an average day, he reads books, talks to friends, takes walks, and goes to physical therapy.  (Tr. 34-35.)  Dereje first testified that medications help his depression, but then he testified that medications do not help his depression.  (Tr. 39-40.)  He said that depression is probably one of the biggest reasons why he cannot work.  (Tr. 40.)

Dr. Lace testified at the hearing as a medical expert.  (Tr. 15, 41-45.)  He opined that Dereje's depression and back pain do not meet or equal a listing for disability.  (Tr. 41.)  Dr. Lace rejected Dr. Karayusuf's opinion because Dereje's treating physician stated that Dereje's depression was mild.  (Tr. 42.)  Dr. Lace did not believe Dereje's depression resulted in any work restrictions.  (Tr. 41.)

At the hearing, the ALJ posed several vocational hypothetical questions to the vocational expert, Mitch Norman.  (Tr. 43-45, 238.)  The first hypothetical question assumed the individual was restricted to simple, routine work with brief and superficial contact with the public and coworkers; sedentary exertional work with no exposure to concentrated air pollutants; avoid unprotected heights, inclines, and uneven surfaces; and he required the ability to stand for a couple minutes after sitting for thirty minutes. (Tr. 43-44.)  Norman testified that such a person could not perform Dereje's past relevant work, but he could perform other jobs in the regional economy such as PC

board assembler[14] or lens inserter.[15]  (*Id.*)  Norman also testified that fluency in English is not a prerequisite for those jobs.  (*Id.*)

For a second hypothetical question, the ALJ included the same mental restrictions, but with a light exertional level, and only occasional climbing ramps and stairs, occasional stooping, kneeling, crouching or crawling.  (Tr. 44-45.)  Norman testified that such a person could perform the position of an assembler of plastic hospital products,[16] and fluency in English was not required. (Tr. 45.)

Dereje's counsel also asked Norman a hypothetical vocational question, assuming the individual required more than the industry standard breaks to allow him to lie down or elevate his legs.  (Tr. 46.)  Norman testified that a person could not perform competitive employment if his production was 10-15% lower than that of other workers. (*Id.*)

### E.    ALJ's Decision

On April 6, 2012, the ALJ made the following findings and conclusions on Dereje's application.

> 1. The claimant has not engaged in substantial gainful activity since February 25, 2011, the application date (20 CFR 416.971 *et seq.*). . . .
>
> 2. The claimant has the following severe impairments: status-post left tibia fracture, degenerative disc disease, and depression (20 CFR 416.920(c)). . . .

---

[14] Dictionary of Occupational Titles ("DOT") Code 726.684-110, with 2,900 such jobs in Minnesota.
[15] DOT 713.687-026, with 1,150 such jobs in Minnesota.
[16] DOT 712.687-010, with 8,700 such jobs in Minnesota.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926). . . .

4. . . . [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b)[;] no concentrated exposure to air pollutants; no unprotected heights; no inclines or uneven surfaces; with a sit/stand option after approximately 30 minutes (i.e. the person would be able to briefly stand or sit after working for a half an hour) limited to simple, repetitive, routine-type work activities; involving only brief and superficial contact with coworkers and the public. . . .

5. The claimant is unable to perform any past relevant work (20 CFR 416.965). . . .

6. The claimant was born on September 7, 1965 and was 45 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant is not able to communicate in English, and is considered in the same way as an individual who is illiterate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)). . . .

10. The claimant has not been under a disability, as defined in the Social Security Act, since February 25, 2011, the date the application was filed (20 CFR 416.920(g)).

(Tr. 10-17.)

The ALJ found Dereje's objective medical findings to be generally mild.  (Tr. 13.) Dereje's treating physician said that his asthma was mild and intermittent.  (*Id.*)  Early 2010 imaging showed only mild lumbar levoscoliosis, mild disc protrusions, adequately preserved nerve root canals, and solid union of the left tibia.  (*Id.*)  One year later, Dr. Trowbridge noted Dereje's physical examination was normal, and he had full range of motion.  (*Id.*)  During a 2011 mid-year consultative examination, he did not have full range of motion, but he otherwise had objectively normal findings.  (*Id.*)  Additionally, his medications were effective in reducing his pain.  (*Id.*)

The ALJ cited evidence that Dereje exaggerated his pain, including the opinions of Drs. Friedland and Thomas.  (Tr. 13.)  The ALJ also noted Dereje once reported having no back or joint pain.  (*Id.*)  Dereje's diagnosis of major depression with psychotic features was accommodated by the RFC, according to the ALJ, because Dr. Trowbridge said his depression was mild and controlled, he had no psychiatric care in 2011, and his mental health treatment was routine and conservative.  (Tr. 13-14.) Furthermore, Dereje was pleasant and cooperative, alert and oriented, and only moderately depressed on examination by Dr. Karayusuf.  (Tr. 14.)  The ALJ found Dereje was not credible because he was so inconsistent in his interview with Dr. Karayusuf.  (*Id.*)

The ALJ also found that Dereje's sporadic work history eroded his credibility. (*Id.*)  Although Dereje's daily activities were fairly limited, daily activities cannot be objectively verified, and the weak medical evidence did not support Dereje's limitations in daily activities.  (*Id.*)  The ALJ credited Dr. Johnson's opinion that Dereje should avoid heights, inclines and uneven surfaces.  (*Id.*)  He also gave great weight to Physician

Assistant Marwa's early 2010 opinion that Dereje could return to light work, finding this consistent with the objective evidence in the record.  (Tr. 15.)

The ALJ did not credit the three Medical Opinion forms completed by Dr. Trowbridge because her opinions were conclusory and inconsistent with her treatment notes.  (*Id.*)  The ALJ opined that Dr. Trowbridge uncritically accepted Dereje's subjective complaints.  (*Id.*)  But, the ALJ also rejected opinions that Dereje had no physical or mental work restrictions.  (*Id.*)  The ALJ found Dr. Karayusuf's opinion was generally consistent with the record, but there was no objective reason to limit Dereje's ability to tolerate supervision or limit him to infrequent social interactions with coworkers and the public.  (Tr. 16.)  The ALJ relied on the VE's testimony that a person with Dereje's residual functional capacity, as found by the ALJ, could perform the job of plastic hospital products assembler.  (Tr. 16-17.)

## II.    DISCUSSION

### A.    Standard of Review

Review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Murphy v. Sullivan*, 953 F.2d 383, 384 (8th Cir. 1992).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).  "'Substantial evidence on the record as a whole' . . . requires a more scrutinizing analysis."  *Id.* (quotation omitted).  In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).  Yet, the Court must consider

evidence supporting and detracting from the Commissioner's decision.   *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006).

To be entitled to SSI, a claimant must be disabled as defined in the Social Security Act.   42 U.S.C. § 1382c.   A "disability" is an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   *Id.* § 1382c(3)(A); *and see* 20 C.F.R. § 416.905.   The Social Security Administration adopted a five-step procedure for determining whether a claimant is "disabled" within the meaning of the Social Security Act.   20 C.F.R. § 416.920(a)(4).   The five steps are (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or medically equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy.   *Id.* § 404.920(a)(4)(i-v).   The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner.   *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. § 404.1512(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991.)

### B.    Issues

Dereje raises three primary arguments in support of his motion for summary judgment.   Dereje asserts the ALJ erred in finding he does not meet or equal Listing 1.04C, Disorders of the Spine, because he has lumbar stenosis that results in

pseudoclaudication, and he cannot ambulate effectively.   At the next step of the disability evaluation process, Dereje contends the ALJ's RFC finding is not supported by substantial evidence.  Within this argument, Dereje asserts the ALJ erred in rejecting his treating physician's opinion, which was based on occupational testing and supports a less than sedentary RFC.  Dereje further asserts the ALJ relied on a flawed hypothetical vocational question and response by the vocational expert because the work restrictions were inaccurate and based on opinions of non-treating doctors.   In the alternative, Dereje contends remand is required for the ALJ to obtain material evidence of the severity of Dereje's mental disorders and other records supportive of disability.

### 1. Listing 1.04 Disorders of the Spine

At the third step of the disability evaluation process, if a person meets or equals one of the listings in 20 C.F.R. § 404, subpart P, Appendix 1, and meets the duration requirement, he will be found disabled without further consideration of his age, education and work experience.   20 C.F.R. § 416.920(a)(4)(iii) and (d).   Listing 1.04 Disorders of the Spine is met where a disorder of the spine results in:

> compromise of a nerve root (including the cauda equina) or the spinal cord.  With
>
> . . .
>
> C.    Lumbar    spinal    stenosis    resulting    in pseudoclaudication,[17] established by findings on appropriate medically    acceptable    imaging,    manifested    by    chronic

---

[17] Pseudoclaudication is a result of narrowing of the lumbar spinal canal (lumbar spinal stenosis) putting pressure on the spinal nerve roots.  It typically causes pain and discomfort in the buttocks, thighs, legs and feet with walking or prolonged standing, and potentially numbness and weakness in the legs.  The pain is typically relieved by sitting or bending forward at the waist, reducing nerve pressure.  Available at http://www.mayoclinic.org/pseudoclaudication/expert-answers/faq-20057779.

> nonradicular pain and weakness, and resulting in inability to
> ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04 (2012).   Section 1.00B2b of

Appendix 1 defines inability to ambulate effectively as follows:

> (1) Definition.   Inability to ambulate effectively means an
> extreme limitation of the ability to walk; i.e., an impairment(s)
> that interferes very seriously with the individual's ability to
> independently initiate, sustain, or complete activities.
> Ineffective ambulation is defined generally as having
> insufficient lower extremity functioning (see 1.00J) to permit
> independent ambulation without the use of a hand-held
> assistive device(s) that limits the functioning of both upper
> extremities. . . .
>
> (2) To ambulate effectively, individuals must be capable of
> sustaining a reasonable walking pace over a sufficient
> distance to be able to carry out activities of daily living. They
> must have the ability to travel without companion assistance
> to and from a place of employment or school. Therefore,
> examples of ineffective ambulation include, but are not
> limited to, the inability to walk without the use of a walker,
> two crutches or two canes, the inability to walk a block at a
> reasonable pace on rough or uneven surfaces, the inability
> to use standard public transportation, the inability to carry
> out routine ambulatory activities, such as shopping and
> banking, and the inability to climb a few steps at a
> reasonable pace with the use of a single hand rail. The
> ability to walk independently about one's home without the
> use of assistive devices does not, in and of itself, constitute
> effective ambulation.

Dereje had objective evidence of spinal stenosis under 1.04C before he applied for SSI,

but the condition did not last for twelve months from the date he filed his SSA

application, February 25, 2011.  On December 14, 2011, Dereje's lumbar MRI showed

he no longer had lumbar stenosis or contact to any nerve root from disc herniations.

(Tr. 618, 571-72.)  Furthermore, there is much evidence in the record that Dereje was

able to ambulate effectively, very infrequently using one crutch or a cane.  (Tr. 280, 283,

421, 480, 500, 558, 563, 615.)   Therefore, substantial evidence in the record supports the ALJ's determination that Dereje did not meet or equal Listing 1.04.

### 2. RFC Determination

At steps four and five of the disability evaluation, the ALJ assesses the claimant's residual functional capacity ("RFC").  20 C.F.R. § 416.920(a)(4)(iv-v).  RFC is the most a person can do despite his or her limitations.  20 C.F.R. § 416.945(a)(1).   "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence. . . . The ALJ . . . bears the primary responsibility for assessing a [claimant's RFC] based on all relevant evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005) (citations and quotation omitted).  The ALJ considers all of the medical opinions from treating and nontreating sources, 20 C.F.R. § 416.927(c), and an "ALJ must resolve conflicts among the various opinions." *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009).

Credibility of subjective complaints such as pain is another factor in the ALJ's RFC determination.  20 C.F.R. § 416.945(e); 20 C.F.R. § 416.929(c)(3).  In evaluating a claimant's subjective complaints, the ALJ cannot rely solely on the lack of objective medical evidence, and the ALJ must consider:  1) the claimant's daily activities; 2) the duration, frequency and intensity of pain [or other subjective complaint]; 3) precipitating and aggravating factors; 4) dosage, effectiveness, and side effects of medication; 5) functional restrictions; and 6) work history. *Polaski v. Heckler*, 739 F.3d 1320, 1322 (8th Cir. 1984).  If an ALJ gives good reasons for discrediting a claimant's testimony, courts should defer to the ALJ's judgment. *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001).

30

Dereje asserts the ALJ erred by failing to credit Dr. Trowbridge's RFC opinion, supported by occupational testing of Dereje's functional work abilities in March 2012. The Commissioner admits the ALJ did not address this opinion by Dr. Trowbridge. But the Commissioner contends the ALJ's failure to address the occupational assessment— the basis for Dr. Trowbridge's RFC opinion—was harmless because substantial evidence in the record is inconsistent with the RFC opinion and Dereje's subjective complaints are not credible.

If a treating physician's opinion on the nature and severity of the claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record, the ALJ must give the opinion controlling weight. 20 C.F.R. § 416.927(c)(2). If the ALJ does not give controlling weight to the treating physician's opinion, the ALJ must give good reasons for the weight given to the treating physician's opinion. *Id.* To show an error was not harmless, the claimant "must provide some indication that the ALJ would have decided differently if the error had not occurred." *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012).

The ALJ rejected Dr. Trowbridge's opinions, although without addressing the opinion supported by the occupational assessment, for three reasons: (1) the opinions were conclusory; (2) the opinions were contrary to the substantial weight of the evidence; and (3) Dr. Trowbridge relied heavily on Dereje's subjective complaints, but Dereje was not credible. Dr. Trowbridge's March 2012 RFC opinion was not conclusory; it was based on the results of Dereje's occupational assessment. For the reasons discussed below, however, the occupational assessment would not have

changed the ALJ's determination that Dr. Trowbridge's opinion was contrary to the substantial weight of the evidence.  *See Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008) ("ALJs are not obliged to defer to treating physician's medical opinions unless they are 'well-supported by medically acceptable and laboratory diagnostic techniques **and** [are] not inconsistent with the other substantial evidence in the record.'" (quoting *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005) (quotations omitted)) (emphasis added).

The record as a whole indicates that Dereje's tailbone fracture and degenerative disc disease objectively improved and did not support Dereje's subjective complaints of pain severely limiting his work abilities for a continuous twelve months after he filed his SSI application on February 25, 2011.  At the administrative hearing, the ALJ implied that if Dereje had applied for SSI soon after his accidents in December 2009, he might have qualified for a closed period of disability based on his fractured tailbone and spinal stenosis.  (Tr. 32-33.)  However, x-ray and MRI evidence from December 2011 showed that Dereje's tailbone had healed, and he no longer had spinal stenosis or significant degenerative disc herniations or other significant degeneration of his spine.  (Tr. 618, 571-72.)

Dereje also complained of chronic leg pain, but there was substantial evidence in the record, particularly his evaluations at Minnesota Orthopaedic Specialists, contradicting his subjective complaints.  Dereje had a metal rod in his leg from an accident in the 1990s, but his leg had healed; he worked for many years thereafter; and CT scans showed there was no objective change to the solid bony union of his old tibia fracture during the relevant period.  (Tr. 309, 333, 484-85, 182, 238.)  Dereje stressed

that he had been working two jobs for eighty hours a week until his December 2009 accidents, and he was healthy and pain-free before the accidents.  (Tr. 30, 280, 333, 652.)  Physician Assistant Jeff Ballard opined that Dereje's leg pain was likely caused by his spinal stenosis, not his previous leg injury.  (Tr. 483.)  Dereje's spinal stenosis improved, removing any objective basis for his complaints of leg pain.  (Tr. 571-72.)

Dereje alleged his leg pain prevented him from walking any significant distance, and he used an assistive device.  (Tr. 615, 629, 652.)  Dereje arrived at one of his Social Security consultative examinations with one crutch, but he never had the crutch with him on other examinations.  Nor was it noted that he carried a cane.  Although Dereje at times had a limp or antalgic gait, other times his gait was normal and/or he appeared to have no difficulty walking.  (Tr. 280, 283, 421, 480, 500, 558, 563, 615.)  When Dereje attended a routine annual examination in May 2010, he had no complaints of back or leg pain, and his examination was normal.  (Tr.   557-58.)  Dr. Friedland commented that he reviewed Dereje's May 18, 2010 nutritional  consultation,[18] and it indicated Dereje had started running for exercise.  (Tr. 339.)

There is no reason to believe the ALJ's determination that Dereje's subjective complaints are not credible would have been different if the ALJ had discussed the occupational assessment.  The record is full of reasons to question Dereje's credibility.  First, there is significant evidence of Dereje's symptom magnification.  *See Guilliams*, 393 F.3d at 802-03 (evidence of symptom magnification and other evidence inconsistent with subjective functional restrictions supported ALJ's decision to discount claimant's credibility).  When Dr. Trowbridge first evaluated Dereje in January 2011, she

---

[18] The May 18, 2010 nutritional consultation is not in the administrative record.

noted he was very dramatic about his pain, and he gave poor effort on the straight leg raise test, calling into question the reliability of the test result.  (Tr. 349.)  Just a few weeks earlier, an emergency room physician questioned whether Dereje's complaints of back pain were psychogenic because Dereje reported that moving his toes caused back pain. (Tr. 524.)  Drs. Thomas and Friedland made similar findings that Dereje reported pain from activities on examination that would not be expected to cause the alleged pain.  (Tr. 284-85, 335, 341.)  In October 2011, Dr. Ferron noted Dereje exhibited exaggerated pain behaviors.   (Tr. 653.)   Drs. Kjome and Steven found nothing significant in Dereje's December 2011 lumbar MRI to support his pain complaints, and they declined to complete a disability opinion for Dereje.  (Tr. 572.)

Second, Dereje often told providers that his pain began after his December 2009 accidents and only worsened over time.  This is contrary to what Dereje told Physician Assistant Marwa in February 2010, when he asked for a letter stating he could return to light-duty work and that he was doing well in physical therapy.  (Tr. 554.)  This was followed by Dereje's normal physical evaluation in early May 2010, and then his markedly different presentation on May 20, 2010 to Dr. Thomas, who was evaluating his injuries from the December 2009 car accident for litigation.   (Tr. 557-58, 283-84.) Apparently Dereje also worked in 2011, as he told Nurse Sarah Heinle on December 13 2011, that he had been laid off his job after falling at work one month ago.  (Tr. 615.)

Third, Dereje made completely contradictory statements throughout his interview with Dr. Alford Karayusuf.  (Tr. 460-62.)  Even though Dr. Karayusuf did not believe Dereje was intentionally lying, this demonstrates that Dereje was comfortable making contradictory statements of facts, making his subjective complaints unreliable.  At the

administrative hearing, one minute Dereje testified that medication for depression was helpful, and the next minute he testified to the contrary. (Tr. 39-40.) Thus, the findings of the occupational assessment are inconsistent with substantial evidence in the record as a whole, suggesting Dereje objectively improved after two accidents in December 2009; he exaggerated symptoms; and he made inconsistent statements.

The findings of the occupational assessment are also of limited value because the occupational therapist, Gretchen Welshons, noted that Dereje's increase in symptoms when he engaged in lifting, pushing and pulling exercises was in part due to poor body mechanics. (Tr. 628.) Importantly, Welshons' recommendations for sitting, standing and walking restrictions were explained only by the statement that Dereje demonstrated a low tolerance for these activities on the day of testing, which is not an entirely objective finding. (Tr. 629.) The recommended work restrictions were also qualified by the fact that Dereje said he was not performing stretching or strengthening exercises for his trunk or lower extremities, and Welshons recognized that Dereje's mobility might improve with physical therapy. (*Id.*) Home exercises were taught and recommended in Dereje's physical therapy treatment programs. (Tr. 628-29, 489, 500, 513.) *See Guilliams*, 393 F.3d at 802 (failure to follow a recommended course of treatment weighs against credibility). Finally, there is no support in the occupational assessment or the record as a whole, apart from Dereje's subjective complaints, for Dr. Trowbridge's opinion that Dereje would miss more than three days of work per month due to his impairments.

Overall, the occupational assessment did little to substantiate Dereje's subjective complaints and would not have changed the outcome of the ALJ's decision. Notably,

the ALJ's RFC opinion allowed Dereje a sit/stand option every thirty minutes in an eight-hour work day, only requiring Dereje to work one hour longer per day than Welshons recommended.  And, nowhere in the record prior to the occupational assessment was Dereje limited to less than light exertional lifting, 20 pounds occasionally and 10 pounds frequently.  Therefore, the ALJ's failure to discuss the occupational assessment and Dr. Trowbridge's adoption of the work restrictions therein was harmless error.  On the other hand, the objective medical evidence of record, showing improvement in Dereje's December 2009 injuries, coupled with Dereje's lack of credibility, supports the ALJ's decision to credit Physician Assistant Marwa's opinion that Dereje could perform light exertional work.  In July 2010, Dereje's chiropractor also opined that Dereje should have light exertional work restrictions.  (Tr. 290.)

### 3.    Development of the Record

In the alternative to a remand for award of benefits, Dereje contends the ALJ should further develop the record by obtaining additional evidence of his mental disorders, particularly records indicating that he was psychiatrically hospitalized, contrary to the finding by the ALJ that he was not, and records of his March 14, 2012 appointment, scheduled for purposes of ruling out a thought disorder.   The Commissioner asserts it is Dereje's burden to prove disability, and he did not obtain or try to obtain the records he is complaining about.

"An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision."  *Warburton v. Apfel*, 188 F.3d 1047, 1051 (8th Cir. 1999) (quoting *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994) (citing 20 CFR § 416.927(c)(4))).

Absent unfairness or prejudice by the ALJ's failure to develop the record, remand is not required. *Onstad v. Shalala*, 999 F.3d 1232, 1234 (8th Cir. 1993).  For several reasons, further development of the record by the ALJ is not required.  First, it is doubtful that there are records showing Dereje was psychiatrically hospitalized during the relevant period.  Dereje made inconsistent statements to providers about whether he was ever psychiatrically hospitalized.  On January 24, 2011, he told Social Worker Liz Weir he had never been psychiatrically hospitalized and only had one suicide attempt when he was much younger.  (Tr. 362.)  However, he told Dr. Karayusuf he was psychiatrically hospitalized at the Hennepin County Medical Center for suicide attempt when his children were taken, and he was hospitalized in Fairview for depression just two months earlier.  (Tr. 461.)

As to hospitalization at UMMC Fairview, there is a medical record showing Dereje went to the emergency room in April 2011, about three months before his consultative examination with Dr. Karayusuf.   (Tr. 415-18.)   He complained of depression and insomnia, but his mental status examination was normal other than depressed mood without suicidal thoughts.  (Tr. 417.)  He was prescribed Ambien and released the same day.  (*Id.*)

As to Hennepin County Medical Center, the SSA requested medical records on behalf of Dereje, and no records of treatment were found for the time period requested. (Tr. 343-44.)  Dereje requested copies of his medical records from Hennepin County Medical Center, specifying that he wanted records of treatment from January 1, 2010 to the present, and he produced those records but there were no records indicating hospitalization.  (Tr. 518-25.)  Although there is some suggestion in the record that

Dereje was hospitalized for suicide attempt while he was in prison in 2008-2009, which corresponds to the time when his children were placed in foster care, there is nothing in the record indicating he was suicidal or even suffered more than mild depression near the time he filed an SSI application in February 2011.  As a result, the earlier records are not relevant.

Finally, Dereje asserts the ALJ should obtain the medical records of his March 14, 2012 consultation to rule out thought disorder.  None of Dereje's mental status examinations showed any abnormalities of thought, and he was inconsistent about whether he heard voices or saw things that were not present.  Dereje never alleged that he was functionally limited by hallucinations or thought disorder.  If Dereje in fact attended the scheduled consultation and believed the records were important to his case, he was given many notices of the importance of submitting new evidence. Dereje, who was represented by counsel, received the following notices to submit new evidence concerning his claim:  Exhibit List on February 8, 2012 (Tr. 224-34) advising him to schedule the hearing when all relevant evidence is up to date (Tr. 235-36); the Notice of Hearing sent on February 28, 2012 (Tr. 124); the ALJ's April 6, 2012 Notice of Decision, informing Dereje he could file new evidence on appeal (Tr. 6); and, on June 1, 2012, Dereje's new counsel requested additional time to appeal, but no new evidence was submitted to the Appeals Council. (Tr. 24, 1-4.)  For these reasons, the ALJ is not required to seek additional medical records.

## III.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**RECOMMENDED THAT**:

1.    Plaintiff's motion for summary judgment (Doc. No. 23) be **DENIED**;

2.    Defendant's motion for summary judgment (Doc. No. 28) be **GRANTED**; and

3.    If this Report and Recommendation is adopted, that judgment be entered and the case dismissed.

DATE:   January ___28___, 2014

_____
        *s/ Tony N. Leung*
TONY N. LEUNG
United States Magistrate Judge

*Dereje v. Colvin*
File No. 12-cv-3010 (DSD/TNL)

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before **February 12, 2014**.